Department of Health and Welfare,
Office of Health Planning & Development
No. 80-470

## APPEAL OF BEHAVIOR SCIENCE INSTITUTE
### (New Hampshire Department of Health and Welfare, Office of Health Planning and Development)

October 30, 1981

*Troisi Professional Association,* of Salem (*Daniel J. Scanlon* on the brief and orally), for the Behavior Science Institute.

*Devine, Millimet, Stahl & Branch,* of Manchester (*David H. Barnes* on the brief and orally), for Community Care Systems, Inc.

*Gregory H. Smith,* attorney general (*Betsy S. Westgate,* assistant attorney general, on the brief and orally), for New Hampshire Office of Health Planning and Development.

KING, C.J. The issue in this case is whether the New Hampshire Department of Health and Welfare, Office of Health Planning and Development, after a reconsideration hearing, properly retracted the certificate of need for a psychiatric hospital which it had previously granted to Behavior Science Institute. We remand.

On October 25, 1979, Behavior Science Institute submitted a letter of intent to the New Hampshire Office of Health Planning and Development (State agency) pursuant to RSA ch. 151-C, which regulates all new proposed institutional health services. RSA 151-C:1 I (Supp. 1979); RSA 151-C:7 IV (Supp. 1979). The letter stated that Behavior Science intended to construct and operate a sixty-bed psychiatric hospital in Salem, New Hampshire. The letter further stated that the estimated total cost of the project was $1,500,000, and that the estimated date of financial obligation to undertake the project, and of project initiation, was March 15, 1980.

The State agency duly complied with RSA 151-C:7 V (Supp. 1979), which requires newspaper publication and that written notice of the receipt of such letter of intent be provided to all "affected persons." The public notice included the proposed number of beds and the location of the hospital and indicated that the deadline for the submission of any competing applications was December 24, 1979, a date which complied with the statutory deadline of sixty days. RSA 151-C:7 VI(b)(1) (Supp. 1979). Community Care Systems, Inc., received notice only through the newspaper publication.

On December 27, 1979, Behavior Science notified the State agency in writing of its intention to relocate the site of the proposed psychiatric hospital to the Nashua area. The letter indicated that the intention to relocate had been previously communicated to the State agency on November 6, 1979, and that the State agency had stated that such a change was permissible. On December 28, 1979, Behavior Science submitted a draft containing a revised estimate of construction costs from $2,557,764 to $3,410,352, a method for financing, and a statement that the location would be the "Greater Nashua" area and "Hillsborough County." The public was not given notice of the changes.

The formal application of Behavior Science for a certificate of need to establish the hospital in Nashua was submitted to the State agency on January 25, 1980, on forms provided by the agency for such purpose. RSA 151-C:7 III (Supp. 1979). As required by RSA 151-C:7 XI (Supp. 1979), the State agency gave written notice to Behavior Science and to the numerous other affected persons as defined by the statute, RSA 151-C:7 V (Supp. 1979), and published notice in newspapers, that it had begun formal review of Behavior Science's application to construct a sixty-bed psychiatric hospital in the Nashua area at an estimated cost of $3,400,000. See RSA 151-C:7 XI (Supp. 1979).

Behavior Science's application was found incomplete under RSA 151-C:7 VIII(b) (Supp. 1979), and Behavior Science submitted additional information on February 26, 1980, which included a statement that Behavior Science would be given a six-month option to buy either of two parcels of land in Nashua or Merrimack. The submitted letter also indicated that one investor, Gerald Nash, had expressed a willingness to construct the hospital on the Merrimack site for $1,750,000.

In the meantime, Community Care Systems, Inc. (Community Care) submitted a letter of intent on February 12, 1980, that, as an "original applicant," it proposed to construct an eighty-four-bed psychiatric hospital in the city of Manchester. Its application was not treated by the State agency as a "competing application" to that of Behavior Science because it had not been filed within sixty days after the filing of Behavior Science's application, as required by RSA 151-C:7 VI (Supp. 1979). As indicated by the State agency's memorandum, Community Care also filed a competing application with respect to an application of Medical Management Associates, Inc., on February 12, 1980, and then withdrew its letter of intent as an original applicant. Nevertheless, the State agency continued to process Community Care's application as an original applicant.

On March 4, 1980, the State agency informed Behavior Science that its application was still incomplete, and referred to the project as a psychiatric hospital in Salem to be built at an estimated cost of $1,500,000. Three days later on March 7, 1980, Behavior Science responded by bringing to the agency's attention the fact that its application proposed a hospital in "Nashua" involving a total expenditure of $3,410,352. On March 12, 1980, Behavior Science notified the State agency that the total project cost would be reduced to $2,142,800 in accordance with the estimate received from Gerald Nash of the cost of construction at the Merrimack site.

Having determined that Behavior Science's application was complete, the State agency concluded its review of the application, as required by RSA 151-C:7 VIII (Supp. 1979), by March 19, 1980, and so notified Behavior Science. The notification, however, requested that Behavior Science furnish additional data concerning the financing of the project.

RSA 151-C:7 XV (Supp. 1979) recommends that the State agency seek the recommendation of the designated United Health Systems Agency (HSA) for the health service area in which the proposed new institutional health service is to be offered or developed, as to whether a certificate of need should be issued. As a consequence thereof, on May 8, 1980, the designated HSA held a public hearing on the application of Behavior Science. The HSA voted to recommend the denial of Behavior Science's application and forwarded its recommendation to the State agency on July 2, 1980.

On July 11, 1980, in response to the HSA's recommendation of denial, Behavior Science submitted supplemental material to the State agency as rebuttal to the factual findings of HSA. The rebuttal also indicated that Gerald Nash and Samuel Tamposi would construct the hospital in Nashua and lease it to Behavior Science. On July 29, 1980, Behavior Science submitted a letter and further supplemental material which amended its original application by reducing the proposed bed capacity from sixty to fifty beds. The letter also included revised income and operating cost projections. By letter dated August 5, 1980, Behavior Science supplied a revised estimate of $2,142,800 as the estimated total capital cost of the fifty-bed hospital project.

On August 6, 1980, the State agency approved the amended application of Behavior Science and issued a certificate of need for the proposed fifty-bed hospital at the Kessler Farm site in Nashua at an approved cost of $2,142,800. On the same date, the agency adopted a .15 beds per 1,000 persons limit on the number of psychiatric hospital beds in the State of New Hampshire.

On August 20, 1980, and August 22, 1980, Community Care and the HSA, respectively, filed requests with the State agency for reconsideration of the award of a certificate of need to Behavior Science, pursuant to RSA 151-C:8 V (Supp. 1979). On September 26, 1980, the State agency granted the requests for reconsideration in order to determine whether there was sufficient disclosure to opposing parties of Behavior Science's application, and whether those parties had to be heard relative to the information which Behavior Science supplied to the State agency, on July 11, 1980, and July 29, 1980.

The reconsideration hearing was held on October 20, 1980, before Edgar J. Helms, Jr., Commissioner of Health and Welfare, who had appointed himself hearing officer. By decision dated November 12, 1980, the State agency reversed its August 6, 1980, decision approving Behavior Science's application and granting it a certificate of need for a hospital facility at the Kessler Farm site in Nashua.

The State agency decided that Behavior Science had supplied insufficient data under RSA 151-C:6 (Supp. 1979) to support the granting of a certificate of need. The agency interpreted the statutory requirements of RSA 151-C:6 (Supp. 1979) by examining the criteria for determining whether a project is subject to agency scrutiny found in RSA 151-C:4 I (Supp. 1979). Because financial information is required under RSA 151-C:4 I (Supp. 1979), the agency concluded that the same data must be supplied under RSA 151-C:6 (Supp. 1979). After reviewing the financial data supplied by Behavior Science during the entire application process, the agency concluded that the data did not meet the sufficiency requirement of RSA 151-C:6 (Supp. 1979).

The State agency also stated that the lack of rules and regulations governing aspects of the application process caused sufficient unfairness as to require a reversal of its August 6, 1980, grant of Behavior Science's certificate of need. The lack of rules defining "competing" applications and the lack of regulations as to the permissible extent of amendments to an application were deemed by the agency sufficient deficiencies to require Behavior Science to resubmit its application.

The State agency concluded that Behavior Science so substantially amended its application during the process that Behavior Science should have been required to start the procedure at the beginning, thereby allowing public notification of the amendments. Much of the agency's examination of the permissibility of amendments focused on the definition of a "complete" application. The term "complete," however, has never been defined by the agency.

Finally, the State agency stated that Behavior Science and Community Care should have been treated as competing applicants. Rejecting strict adherence to the sixty-day limit for filing of competitive applications, the agency relied on the fairness requirement for mutually exclusive applications in concluding that Behavior Science's application should be remanded to the application stage for consideration with Community Care's application.

Without strictly adhering to the requirements of RSA 541:3 and RSA 151-C:9 (Supp. 1979), Behavior Science petitioned this court, appealing the decision of the State agency. Although we could

remand on the narrow issue of Behavior Science's failure to comply with the statutory requirements for appeal, in the interests of both judicial and administrative economy, we shall in this case of first impression under RSA ch. 151-C address some of the questions concerning the State agency's powers, procedures and decisions.

■ Although we agree with Behavior Science that it proceeded without fault through the application process and that it has suffered a detriment as a result of the State agency's decision to retract its certificate of need, we agree with the agency's decision to remand Behavior Science's application, without prejudice, to be considered at the application stage with any competing applications, including Community Care's. The procedures followed were so replete with ambiguities and inconsistencies that such a remand is necessary.

■ The purpose of RSA ch. 151-C is to avoid unnecessary duplication of health care services by creating a system under which all new proposals can be reviewed. RSA 151-C:1 (Supp. 1979). By failing to promulgate rules and regulations governing the application process for new health care facilities, the State agency contributed in large part to the pervading confusion in the proceedings involving Behavior Science's application for a certificate of need. It has been almost two years now since the first application was filed. With the apparent need for psychiatric facilities, it would seem that the agency should move quickly to place its procedural house in order if the cost savings envisioned by the legislature in enacting chapter 151-C are ever to be realized. See RSA 151-C:1 (Supp. 1979).

■ The State agency attempted to define what constituted sufficient data for the completion of an application, but its attempt came too late to cure the defects in Behavior Science's application process. Furthermore, the agency erroneously relied on the provisions of RSA 151-C:4 I in defining the requirements of RSA 151-C:6. RSA 151-C:4 I (Supp. 1979) defines the meaning of "new institutional health service" in order to determine whether a particular proposal is *subject* to the certificate of need requirement of the statute. The provisions of RSA 151-C:6 (Supp. 1979) outline the minimum data required before a certificate of need shall be issued. Any necessary additions to RSA 151-C:6 are within the power of the State agency. The applicable federal statute, 42 U.S.C.A. § 300 n-1 (Supp. 1980), the regulations promulgated thereunder, 42 C.F.R. §§ 122.303–305 *et seq.*, 123.40 *et seq.* (1980), and the State statute, RSA ch. 151-C, contain provisions requiring the

State agency to adopt rules and regulations to augment and enforce these statutes. *See* RSA 151-C:6 IV (Supp. 1979); RSA 151-C:7 VII(b), XIV (Supp. 1979); RSA 151-C:8 V (Supp. 1979). The agency should, therefore, adopt rules and regulations to clarify the requirements of RSA 151-C:6.

■ The State agency should also adopt rules and regulations defining "substantial amendment," "completeness" and "competing" applicants. By failing to clarify these terms, the agency contributed to the unfairness caused to all the parties in this action. Behavior Science had no guidelines on which to rely when "completing" its application or "amending" it. Likewise, Community Care had no clear definition of "competing" applicant on which to base its decision whether to file as an original applicant or as a competing applicant to Behavior Science.

■ Ultimately, the lack of procedures governing the amendment of applications led to the consideration of fundamental changes in Behavior Science's application for a certificate of need without notice to the public and other directly affected persons. This result was both unfair and inconsistent with RSA 151-C:1.

■■ Community Care should have been treated as a "competing" applicant. While we recognize that Community Care did not file for "competing" status within the appropriate time period, RSA 151-C:7 VI(b)(1) (Supp. 1979), Community Care's error must be overlooked in this instance. Community Care had filed under Section 1122 of the Social Security Act, the predecessor to RSA ch. 151-C. *See* RSA 151-C:5 II(a), :11 (Supp. 1979). Although the application for a psychiatric hospital filed under the Social Security Act did not preclude Community Care's obligation to file under RSA ch. 151-C, the application should have indicated to the State agency that Community Care was an "affected person" entitled to notice of Behavior Science's application. RSA 151-C:7 V (Supp. 1979). Additionally, the agency's ruling of August 6, 1980, limiting the number of psychiatric hospital beds in the State to .15 per 1,000 persons, substantially changed the status of Community Care's application relative to Behavior Science's. The agency ruling made the two applications mutually exclusive. Under the *Ashbacker* doctrine, mutually exclusive applications must be considered together in order to insure fair treatment of both. *Ashbacker Radio Corp. v. F.C.C.*, 326 U.S. 327, 333 (1945). *See Bio-Medical Applications v. Department of Health*, 370 So. 2d 19, 23–24 (Fla. Dist. Ct. App. 1979). The number of beds established in the ruling appears to be unreasonably below the national average, but if the

ruling is found reasonable, the grant of one certificate of need may bar any new applicants. It is also unclear whether actively used beds at the New Hampshire Hospital are considered in the formula.

In the reconsideration hearing decision dated November 12, 1980, the commissioner of health and welfare stated that the hearing "was held by the Agency on October 20, 1980 before myself as hearing officer."

RSA 151-C:8 V(b) (Supp. 1979) provides that after the conclusion of the hearing "the *State agency* shall make written findings which state the basis for its decision." (Emphasis added.) Further, throughout RSA ch. 151-C, the "State agency" is directed to perform all functions in the reviewing of the certificate of need. The term is defined at RSA 151-C:2 XXIX (Supp. 1979): " 'State Agency' means the Office of Health Planning established pursuant to RSA 126-A:58." RSA 126-A:58 (Supp. 1979) states: "There is hereby established an office of health planning and development under the commissioner. Said office shall consist of a director and such technical staff as is required to carry out the functions of Public Law 93–641 and amendments thereto."

Behavior Science contests the validity of the procedure by which its certificate of need application was ultimately denied on the basis that the reconsideration hearing was conducted by the commissioner of health and welfare who had no legal authority to do so. Specifically, Behavior Science asserts that "[t]he *Commissioner*, rather than the *State agency* held the hearing. . . ." (Emphasis added.)

While we agree that the State agency was established under the commissioner, RSA 126-A:58 (Supp. 1979), and that the commissioner of health and welfare has the authority to administer the provisions of the federal Health Planning and Development Act in this State, RSA 126-A:59 (Supp. 1979), we cannot agree that the commissioner had the authority to conduct the reconsideration hearing.

Ordinarily, the very purpose of reconsideration is for one who has made a prior determination to consider once again the grounds for that determination. The commissioner can neither nullify nor amend the decision of the State agency, nor can he substitute his decision for that of the State agency. The statute does not grant him any appellate power. *See* RSA 151-C:3 I (Supp. 1979). It is the State agency that shall make written findings on the basis of *"its"* decision. RSA 151-C:8 V(b) (Supp. 1979). It was therefore improper and impermissible for the commissioner to undertake

the reconsideration hearing. We find as totally lacking in merit the argument that it was permissible for him "to undertake to conduct the reconsideration hearing in this case, particularly since this hearing was the first reconsideration hearing to be held under the provisions of RSA ch. 151-C."

 RSA 151-C:7 states that prior to the review of any new institutional health services, the State agency shall, in addition to publishing notice of such projects in newspapers of general circulation, develop and annually update a comprehensive mailing list of the State's health care facilities, health maintenance organizations, and any other person who annually and in writing requests inclusion on the list. RSA 151-C:7 I(a) (Supp. 1979). Here, both Behavior Science and Community Care were given inadequate notice from the State agency concerning the existence of competing applications. Additionally, when there are amendments and changes in an application, all affected parties and the public should be given notice, particularly when the changes are material changes such as the location of the facility, the number of beds or the capital cost.

 While the State agency may disregard the recommendations of the HSA, which acts only in an advisory capacity, RSA 151-C:3 III (Supp. 1979), the HSA may present evidence at a public hearing, as may "all affected persons." RSA 151-C:7 XIX (Supp. 1979). The applicant for a certificate of need may also present evidence to rebut that of the HSA or of any other persons presenting evidence against the applicant. *Id.* The State agency, therefore, had the authority to reject the HSA's recommendation and award a certificate of need to Behavior Science. RSA 151-C:3, :8 (Supp. 1979). The agency also had the authority to conduct a reconsideration hearing. RSA 151-C:8 (Supp. 1979).

The process prior to the reconsideration hearing and the reconsideration hearing itself, however, were so replete with error that the decision must be overturned. We order that all parties begin the application process again. Before any application is acted on by the State agency, the agency must review RSA ch. 151-C to determine what rules and regulations are needed to augment and enforce the provisions of the statute, and must expeditiously promulgate such rules and regulations as may be needed.

For the foregoing reasons, the State agency's decisions of November 12, 1980, and August 6, 1980, are both reversed without prejudice to Behavior Science Institute, or Community Care Sys-

tems, or any other party seeking a certificate of need for a psychiatric hospital in this State.

*For the foregoing reasons we remand for proceedings consistent with this opinion.*

All concurred.