Public Utilities Commission
No. 81-203
No. 81-248

### APPEAL OF GLOBAL MOVING & STORAGE OF NEW HAMPSHIRE, INC. &a.
(New Hampshire Public Utilities Commission)

September 8, 1982

*Ransmeier & Spellman*, of Concord (*Dom S. D'Ambruoso*, on the brief and orally), for the plaintiff Global Moving & Storage of New Hampshire, Inc.

*John L. Ahlgren*, of Portsmouth, by brief and orally, for the plaintiff Coastal Environmental Systems, Inc.

*Cleveland, Waters & Bass*, of Concord (*Michael C. Moyers* on the brief and orally), for the protestants.

BROCK, J.   In this appeal, Coastal Environmental Systems, Inc. (Coastal) and Global Moving & Storage of N.H., Inc. (Global) challenge an order of the public utilities commission (PUC) which vacated the PUC's prior authorization of a transfer of operating authority between Coastal and L. V. Regan Moving & Storage Company, Inc. (Regan). We reverse and remand.

In August 1972, Coastal was organized as a corporation to engage in rubbish disposal and general appliance delivery. In the fall of 1975, it purchased, among other businesses, the business of the Regan corporation. Regan first obtained its household goods carrier certificate from the PUC under the grandfather clauses of RSA 375-A:2 and RSA 375-B:4 (Supp. 1981) and had been engaged in bona fide operations as a property common carrier since 1963. The

PUC authorized transfer of their certificate to Coastal in December 1975. Until 1979, Coastal operated as a household goods carrier under that authority in the Portsmouth area.

Without a certificate issued by the PUC, authorizing household goods carrier operations, a company cannot operate such a business in New Hampshire. RSA 375-A:2; RSA 375-B:4 (Supp. 1981). In order to obtain a certificate, a company may either purchase existing authority (RSA 375-A:7; RSA 375-B:10 (Supp. 1981)), or apply to the PUC for an original certificate (RSA 375-A:5 (Supp. 1981); RSA 375-B:5 (Supp. 1981)).

In the fall of 1979, Coastal decided to put its household goods carrier business up for sale. At the same time, Global, a moving business originally incorporated in Massachusetts, was examining the possibility of entering the New Hampshire market. Global's plan was to operate a statewide household goods moving business in New Hampshire. During their preliminary investigation into the possibility of purchasing property for utilization in a moving business in New Hampshire and of acquiring New Hampshire operating authority, representatives of Global met with a PUC inspector who informed them that Coastal had a household goods carrier's certificate for sale, and that it would be simpler and much less expensive to purchase an existing certificate than to request original operating authority from the PUC. Subsequently, negotiations between Coastal and Global began.

The PUC inspector, who had brought the parties together, told them that the best way for Global to purchase Coastal's operating authority was by stock sale. At that time the PUC's policy was to consider stock transfers as continuations of the same business, which did not require a transfer hearing, whereas "asset transfers" required such a hearing to determine whether the transferred authority was still active.

In April 1980, Coastal signed a preliminary non-binding offer to sell the stock in its household goods carrier division to Global. Until the fall of 1980, however, Coastal continued to offer the household goods carrier business for sale and to negotiate for its sale with other interested parties.

In order to separate its household goods carrier business from its other operations, Coastal formed a new corporation, Regan. Because this transaction was deemed a transfer of assets, Coastal applied to the PUC for a transfer of its operating authority to Regan. Coastal retained its other business operations in its name. In their August 1980 application to the PUC for transfer of operating authority, Coastal and Regan stated that Regan would operate the moving and

storage business, previously operated by Coastal, as a separate entity, but that Regan would continue to provide the same services at the same rates as Coastal had done until then. It further represented that the transfer was a purely internal and organizational measure and made no reference to the fact that Coastal had been attempting to sell its moving and storage business.

In September 1980, the PUC scheduled a hearing on the requested transfer and gave other certificate holders and the public notice. Three household goods carriers filed protests against Coastal's request for transfer of its operating authority. One of them advised the PUC that the dormancy (i.e. non-activity) of Coastal's authority could be an issue to consider in authorizing the asset transfer. None of the protestants, however, appeared at the September 15 hearing to oppose the transfer.

Noting that Coastal and Regan had common officers and stockholders, that Regan planned to continue to provide the same services at the same rates as Coastal, and stating simply that "Coastal appears to have operated under this certificate doing business as L. V. Regan Moving & Storage Co. Inc.," the PUC approved the transfer of operating authority from Coastal to Regan on September 25, 1980. It did not investigate the issue of the alleged dormancy of Coastal's authority.

On November 6, 1980, Global and Coastal entered into an agreement whereby Global would purchase the Regan stock from Coastal, and the sale was completed on November 20, 1980. On November 24, 1980, Global requested the PUC to process a name change on the operating authority. On November 26, 1980, according to its long-standing custom and procedure, the PUC routinely approved the name change from Regan to Global.

On December 4, 1980, fourteen household goods carriers filed a petition to suspend the order which granted the name change, making the following allegations: (1) the transfer of authority from Coastal to Regan was a subterfuge designed to facilitate the subsequent sale of stock to Global and circumvent the necessity of a full transfer hearing; (2) the authority held by Coastal at the time of the transfer to Regan was dormant; and (3) Global had failed to demonstrate the public convenience and necessity for transforming a local company operating in the Portsmouth area into a statewide carrier.

The PUC held two hearings on the protestants' petition at which evidence was presented on the issue of dormancy of Coastal's operating authority, and on the circumstances surrounding the subsequent stock sale. The PUC's order issued following these

hearings vacated its previous authorization of the transfer of authority from Coastal to Regan and the name change on the authority from Regan to Global, and revoked the operating authority. After their motions for rehearing were denied by the PUC, Coastal and Global both appealed the PUC's order to this court.

They first contend that the PUC erred when it reconsidered its prior authorization of the asset transfer and the name change and reinvestigated the issue of dormancy of Coastal's operating authority. The PUC answers that its reason for reinvestigating the dormancy issue was that it had not had an opportunity to investigate that issue at the time of the asset transfer hearing held in September 1980. It contends that because Coastal did not disclose its planned sale of Regan stock to Global at the hearing, the PUC and the protestants had been induced to believe that the requested transfer from Coastal to Regan was a simple in-house organizational measure, which did not require a full investigation of the activity of dormancy of the transferred authority.

■■ The PUC's longstanding practice has been to treat "asset transfers" in a different manner than "stock transfers." "Asset transfers", the actual transfer of *operating authority* from one company to another, are the subject of an investigation and hearing at which the PUC determines whether and to what extent the transferred operating authority is active. *See* RSA 375-A:7; RSA 375-B:10 (Supp. 1981). "Stock transfers", the sale of one corporation's *stock* to another corporation, on the other hand, are simply acknowledged by the PUC which routinely approves name changes requested subsequent to stock transfers, without investigation or hearing. The fact that the PUC, in interpreting and exercising its statutory authority, has for a prolonged period consistently treated "stock transfers" differently from "asset transfers" without legislative interference, may be considered as evidence that this practice conforms to the legislative intent. *See Win-Tasch Corp. v. Town of Merrimack*, 120 N.H. 6, 9–10, 411 A.2d 144, 146 (1980) (citing *New Hampshire Retail Grocers Ass'n v. State Tax Comm'n*, 113 N.H. 511, 514, 309 A.2d 890, 892 (1972)); *see also Wyatt v. State Board of Equalization*, 74 N.H. 552, 569, 70 A. 387, 396 (1908); *see generally Ford Motor Co. v. F.T.C.*, 673 F.2d 1008, 1009–10 (1981). In any event, we conclude that Coastal could have reasonably relied on the longstanding administrative practice of the PUC not to exercise jurisdiction over stock transfers or sales and could have expected that this practice would apply to Coastal's case.

*See generally Appeal of Behavior Science Institute*, 121 N.H. 928, 935, 436 A.2d 1329, 1332–33 (1981).

■ Moreover, the PUC is not in a position to blame its failure to investigate the issue of dormancy on Coastal, because it had in fact received notice that dormancy might be an issue for it to consider in the authorization of the asset transfer, and it had ample opportunity to elicit the necessary information to resolve this issue at the asset transfer hearing. The PUC's order, authorizing the original asset transfer from Coastal to Regan, implied a finding that Coastal's operating authority was not dormant, and that finding was dispositive on the issue of dormancy. *See Morin v. J. H. Valliere Co.*, 113 N.H. 431, 434, 309 A.2d 153, 155 (1973); *Household Goods Carriers v. Ouellette*, 107 N.H. 199, 201, 219 A.2d 699, 700 (1966). Because the PUC's order was an administrative decision affecting private rights, it had the effect of a judgment, *see Petition of Boston & Maine Corp.*, 109 N.H. 324, 327, 251 A.2d 332, 336 (1969), to which the principle of res judicata applies and therefore the issue should not have been relitigated. *See Morin v. J. H. Valliere Co.*, 113 N.H. at 434, 309 A.2d at 155; *see also Meserve v. State*, 119 N.H. 149, 154, 400 A.2d 34, 37 (1979) (*citing* 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 18.02, at 548 (1958)).

■ The principle of res judicata, however, does not apply to the issue concerning the geographical scope of the operating authority. Coastal and Global both argue that the protesting parties should not be given another opportunity to litigate the issue of geographical scope of the authority, because they waived their right to do so by not appearing at the original asset transfer hearing. The protestants respond that the reason they did not appear at that hearing was that Coastal's application letter to the PUC reassured them that the asset transfer from Coastal to Regan was a purely internal and organizational matter which would not in any way change the scope of the transferred authority. They state that they would have responded differently had they known that Coastal's operating authority which they claim had been used only in a limited geographical area during the past year was to be transferred to a new company which intended to operate on a statewide basis. Because we conclude that under the circumstances it would be unfair to deny the protestants an opportunity to be heard on this issue, we remand to the PUC for its consideration of the geographical scope of the transferred operating authority. *See* 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 18.02, at 548 (1958).

■ Coastal and Global next challenge the PUC's revocation of

their operating authority. The PUC supported its revocation by a finding that Coastal had intentionally concealed a future sale of Regan stock, thereby wilfully failing to comply with the provisions of the transfer statute, RSA 375-A:6; RSA 375-B:9 (Supp. 1981). We hold that the PUC's finding is erroneous as a matter of law. Coastal had no legal obligation, nor any reason, to disclose a possible future sale of Regan stock at the asset transfer hearing. The stock sale to Global was not yet final, and even if it had been final, Coastal had no reason to disclose it because the PUC's policy, until then, had been not to take jurisdiction over stock sales. We therefore vacate the PUC's order revoking Coastal's operating authority and order that it be reinstated.

*Reversed and remanded.*

All concurred.